This Opinion is a
Precedent of the TTAB

Hearing: September 24, 2021                     Mailed: January 10, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

\_\_\_\_

Trademark Trial and Appeal Board

\_\_\_\_

*Spotify AB*
*v.*
*U.S. Software Inc.*

\_\_\_

Opposition Nos. 91243297 and 91248487

\_\_\_

John L. Slafsky, Sara L. Tolbert and Christine K. Au-Yeung of Wilson Sonsini
Goodrich & Rosati for Spotify AB.

R. Joseph Trojan of Trojan Law Offices for U.S. Software Inc.

\_\_\_\_\_

Before Cataldo, Adlin and Lebow,
   Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

Applicant U.S. Software Inc. seeks registration of POTIFY, in standard

characters, and stylized with a design (  ), for:

> downloadable software for use in searching, creating and
> making compilations, rankings, ratings, reviews, referrals
> and recommendations relating to medical marijuana
> dispensaries and doctor's offices and displaying and
> sharing a user's location and finding, locating, and
> interacting with other users and place, in International
> Class 9.

Applicant also seeks registration of the standard character version of the mark for:

clothing, namely, shirts, tops, t-shirts, hoodies, headwear, shorts, in International Class 25;

providing consumer information in the field of medical marijuana dispensary inventories and locations; providing links to web sites of others featuring consumer information on medical marijuana inventories and locations; providing a web site featuring the ratings, reviews and recommendations on products and services for commercial purposes posted by users; providing consumer information regarding medical marijuana dispensaries, inventories and locations, in International Class 35; and

computer services, namely, creating an on-line community for registered users to participate in discussions, get feedback from their peers, form virtual communities, and engage in social networking in the field of medical marijuana; providing a web site featuring temporary use of non-downloadable software for providing medical and healthcare services, scheduling of medical and healthcare services, in International Class 42.[1]

In its notices of opposition in these consolidated cases, Opposer Spotify AB alleges

prior common law rights in and registration of SPOTIFY, in standard characters, for:

computer software for use in the delivery, distribution and transmission of digital music and entertainment-related audio, text and multimedia content; computer software for enabling transmission, storage, sharing, collection, editing, organizing and modifying audio, messages, images and other data for use in social networking, online chats, creating social networking databases and for use in social networking database management; computer software for creating searchable databases of information and data for peer-to-peer social networking databases, in International Class 9;

---

[1] The standard character application, Serial No. 87530717 (the "'717 Application"), was filed on July 17, 2017 under Section 1(a) of the Trademark Act, based on first use dates of January 1, 2017. The composite word and design mark application, Serial No. 87904185 (the "'185 Application"), was filed on May 2, 2018, also under Section 1(a) of the Act, based on the same first use dates. Applicant acquired both applications by assignment from Easyrec, Inc. (Reel 6496/Frame 0720).

> providing advertising space on the Internet, in International Class 35;
>
> sound and television broadcasting of music and films via the Internet, telephony, or satellite broadcasting; providing on-line chat rooms and discussion forums for transmission of messages and digital pictures among users in the field of general interest; telecommunications on the Internet, namely, audio and video transmission, in International Class 38; and
>
> entertainment, namely, providing music, film to users online via a communication network; providing an online database via a communication network featuring music, films, and entertainment data, in International Class 41.[2]

As grounds for opposition, Opposer alleges that use of Applicant's marks would be likely to cause confusion with, and dilute (by blurring and tarnishment), Opposer's mark, under Sections 2(d) and 43(c) of the Trademark Act, 15 U.S.C. § 1052(d) and 1125(c). In its answers, Applicant denies the salient allegations in the notices of opposition and asserts several "affirmative defenses" which are merely amplifications of its denials.

## I. The Record and Evidentiary Objections

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of Applicant's involved applications. In addition, Opposer introduced:

---

[2] Registration No. 3561218, issued January 13, 2009 under Section 66(a) of the Act, 15 U.S.C. § 1141f(a), based on International Registration No. 0921642; Sections 15 and 71 Declarations accepted. Opposer also pleaded ownership of Registration No. 3564798, but that registration was cancelled well before trial.

Testimony Affidavit of Christopher Butler, the Internet Archive's Office Manager, and the exhibits thereto ("Butler Aff."). 27 TTABVUE.[3]

Testimony Declaration of Kevin Leddy, Digital Forensics Associate with Lighthouse, a litigation support consulting firm, and the exhibits thereto ("Leddy Dec."). 28 TTABVUE.

Testimony Declaration of Jamie Otto, an attorney with Opposer's law firm, and the exhibits thereto ("Otto Dec."). 29 TTABVUE.

First Notice of Reliance ("Opp. NOR 1") on its pleaded '218 Registration, as well as an unpleaded registration and unpleaded applications, and records of Board proceedings. 30 TTABVUE.

Second NOR ("Opp. NOR 2") on Internet printouts and official records. 34 TTABVUE.

Third NOR ("Opp. NOR 3") on Internet printouts. 31 TTABVUE.

Fourth NOR ("Opp. NOR 4") on its discovery deposition of Applicant, Applicant's responses to Opposer's discovery requests, and Internet printouts. 32 and 35 (Confidential) TTABVUE.[4]

Fifth NOR ("Opp. NOR 5") on Internet printouts. 33 TTABVUE.

Testimony Declaration of June Sauvaget, Opposer's Global Head of Consumer and Product Marketing from November

---

[3] Citations are to the record in the "parent" file in Opposition No. 91243297.

[4] Each party submitted documents via NOR identified as "printouts from the Internet showing" documents "produced by" the other party in response to a discovery request. In considering these materials, we have kept in mind that there was no stipulation to introduce documents produced in discovery. Under Trademark Rule 2.120(k)(3)(ii), an adverse party's produced documents are generally not admissible "except to the extent that they are admissible by notice of reliance under the provisions of" Trademark Rule 2.122(e). Documents printed from the Internet are not admissible by notice of reliance under Trademark Rule 2.122(e) unless the URL and date of printing are provided.

2017-September 2020, and the exhibits thereto ("Sauvaget Dec."). 36 and 37-40 (Confidential) TTABVUE.

Rebuttal Testimony Declaration of John Ohle, its subsidiary Spotify USA Inc.'s Senior Product Manager, Legal and Audit Systems and the exhibits thereto ("Ohle Reb. Dec."). 47 (Confidential) and 48 TTABVUE.

Applicant introduced:

First Notice of Reliance ("App. NOR 1") on the file history of one of its uninvolved applications. 41 TTABVUE 95-114.[5]

Second NOR ("App. NOR 2") on third-party registrations. 42 TTABVUE.

Testimony Declaration of Gusein Suleimanov, its founder and Chief Executive Officer, and the exhibits thereto ("Suleimanov Dec."). 43 TTABVUE.

Testimony Declaration of Ivan Suslov, its Chief Operating Officer ("Suslov Dec."). 44 TTABVUE.

Third NOR ("App. NOR 3") on its discovery deposition of Opposer and some of the exhibits thereto, and Opposer's responses to Applicant's discovery requests. 45 and 46 (Confidential) TTABVUE.

Applicant's objection to the Butler Declaration, 53 TTABVUE 3, is sustained because Mr. Butler executed the declaration more than one year prior to trial. Trademark Rule 2.121(a) ("No testimony shall be taken or evidence presented except during the times assigned, unless by stipulation of the parties approved by the Board, or upon motion granted by the Board, or by order of the Board."); *Robinson v. Hot*

---

[5] As indicated, the involved application files are already (and automatically) of record.

*Grabba Leaf, LLC*, 2019 USPQ2d 149089 *3-4 (TTAB 2019), *cancellation order vacated on default judgment*, No. 0:19-cv-61614-DPG (S.D. Fla. Dec. 17, 2019).

Applicant's relevance objections, 53 TTABVUE 3-4, are overruled. Suffice it to say, "we simply accord the evidence whatever probative value it deserves, if any at all … Ultimately, the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence in this specific case, including any inherent limitations." *Hunt Control Sys. Inc. v. Koninkijke Philips Elecs. N.V.*, 98 USPQ2d 1558, 1564 (TTAB 2011). *See also Grote Indus., Inc. v. Truck-Lite Co., LLC*, 126 USPQ2d 1197, 1200 (TTAB 2018) ("We also remind the parties that our proceedings are tried before judges not likely to be easily confused or prejudiced. Objections to trial testimony on bases more relevant to jury trials are particularly unnecessary in this forum.") (citing *U.S. Playing Card Co. v. Harbro LLC*, 81 USPQ2d 1537, 1540 (TTAB 2006)); *RxD Media, LLC v. IP Application Development LLC*, 125 USPQ2d 1801, 1804 (TTAB 2018); *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1478 (TTAB 2017) (quoting *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017)). We have kept Applicant's objections in mind in considering and determining the probative value of Opposer's evidence.

Applicant's objection to Exhibits 6 and 7 to the Sauvaget Declaration (as lacking foundation and unsupported by the declarant's personal knowledge), 53 TTABVUE 4, is also overruled. Ms. Sauvaget has "personal knowledge of the facts within this declaration." 36 TTABVUE 2 (Sauvaget Dec. ¶ 1). The exhibits in question are

publicly available and Applicant was free to introduce evidence contradicting or calling into question the exhibits or Ms. Sauvaget's testimony about them.

Applicant objects to Paragraphs 51-53 of Ms. Sauvaget's Declaration (36 TTABVUE 16), in which Ms. Sauvaget provides her legal and other opinions about the ultimate merits of this case. 53 TTABVUE 4. The objection is unnecessary, and moot. Indeed, "[u]nder no circumstances, may a party's opinion, earlier or current, relieve the decision maker of the burden of making his own ultimate conclusion on the entire record." *Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 198 USPQ 151, 153 (CCPA 1978).

## II. The Parties and Their Marks

Both parties offer software, including mobile apps and related services, but they operate in different fields. Opposer focuses on music and other digital content, while Applicant focuses on marijuana.

### A. Opposer

Opposer is a Swedish company that "develops and distributes software and services for streaming music, podcasts, and other audio-video content." It "launched its business in the United States in 2011." 36 TTABVUE 2, 4 (Sauvaget Dec. ¶¶ 3, 7).

Opposer is perhaps best known for its music streaming services, which allow users to locate and stream music (or other content) from a large database of songs, albums (and other content), using mobile and desktop applications for computers, smartphones and other devices (including speakers, televisions and cars). *Id.* at 3, 20-25 (Sauvaget Dec. ¶ 4 and Exs. 2-4).

While the specifics are mostly designated "Confidential," and will therefore only be discussed generally, Opposer has been incredibly successful. In fact, within a few years of expanding to the United States, and before Applicant's first use of its marks, Opposer's "Monthly Active Users" ("MAUs") represented a sizable percentage of the entire United States population. And, by 2020, the number of Opposer's MAUs had multiplied to a number that could not be attained absent a level of popularity and consumer recognition rarely if ever seen in Board cases. 37 TTABVUE 4, 120-158 (Sauvaget Dec. ¶ 9 and Ex. 5). Opposer's SPOTIFY mobile apps are "consistently" among "the top apps downloaded in the Apple App Store or Google Play Store." 36 TTABVUE 4, 27-34 (Sauvaget Dec. ¶ 10 and Exs. 6-7).

These are far from the only indicia that the pleaded SPOTIFY mark is widely recognized and exceedingly famous in the United States. Opposer has 23.3 million "likes" on Facebook, 5.3 million followers on Instagram, 3.5 million Twitter followers, 1 million followers on LinkedIn and 1 million subscribers on YouTube. *Id.* at 6-7 (Sauvaget Dec. ¶ 23); 31 TTABVUE 12, 24, 47. Opposer has advertised in publications including ROLLING STONE, VANITY FAIR, THE NEW YORK TIMES, BILLBOARD and THE WASHINGTON POST. 36 TTABVUE 7, 106-09 (Sauvaget Dec. ¶ 24 and Ex. 21). Opposer's billboards are large and often feature popular recording artists from the past and present:





*Id.* at 7, 111-115 (Sauvaget Dec. ¶ 25 and Exs. 22-24). Opposer advertises on major television broadcast and cable networks including ABC, NBC, CBS, FOX and ESPN, as well as national radio networks including Westwood One and Urban One. *Id.* at 7 (Sauvaget Dec. ¶ 26). Opposer promotes its SPOTIFY brand at major live events including Coachella, South by Southwest, the Consumer Electronics Show and the

Country Music Association's CMA Fest. *Id.* at 8 (Sauvaget Dec. ¶ 27). It also has promotional relationships with television shows including the "Ellen DeGeneres Show," "Stranger Things" and "Queer Eye":

 



*Id.* at 8, 125, 138, 145 (Sauvaget Dec. ¶ 28 and Ex. 29).[6]

---

[6] Opposer provided what Ms. Sauvaget referred to in her declaration as total (worldwide) "advertising and marketing expenditure totals since 2011," and what is labeled in an

Some of Opposer's promotional efforts have been both unique and highly successful. For example, when President Obama joked that he hoped to work for Opposer after leaving the White House, "Spotify created a job post in January 2017 titled 'President of Playlists' with credentials that could only be met by President Obama." *Id.* at 11 (Sauvaget Dec. ¶ 34). This marketing tactic became "the number one trending moment on Twitter, and claimed the number one spot on Reddit. In under a week, Spotify received 14 million visits to its website and over 900 job applications." *Id.* In addition, recording artists such as Taylor Swift, Lorde, The Weeknd, Lady Gaga, Kendrick Lamar and The Black Keys engage with their fans by making Spotify playlists, and Michelle Obama, Joe Rogan and Kim Kardashian West "have signed exclusive podcast partnership deals with Spotify." *Id.* at 13 (Sauvaget Dec. ¶¶ 41-42).

Opposer's SPOTIFY brand was ranked No. 92 in Interbrand's list of the "Best Global Brands 2019." *Id.* at 15, 367-449 (Sauvaget Dec. ¶ 47 and Exs. 81-84). The same year, Prophet's "Brand Relevance Index" for the United States ranked SPOTIFY No. 2, behind APPLE and ahead of ANDROID, with DISNEY ranking No.

---

illustrative chart as "Total Advertising and Sales Spend." 36 TTABVUE 8, 9 (Sauvaget Dec. ¶ 31). We have not focused on these figures because those that predate Applicant's first use date are not specific to the United States. *See Double J of Broward Inc. v. Skalony Sportswear GmbH*, 21 USPQ2d 1609, 1612 (TTAB 1991) ("Information concerning applicant's foreign activities, including foreign trademark applications and/or registrations, is not relevant to the issues in an opposition proceeding."); *Canovas v. Venezia 80 S.R.L.*, 220 USPQ 660, 662 (TTAB 1983) (claim of fame in France and existence of pending U.S. application based on foreign registration insufficient to establish that fame extended to U.S.).

5 and GOOGLE No. 13.[7] *Id.* An NPR article following Opposer's 2018 initial public offering reported that "the music streaming service Spotify is now worth around $25 billion, making it the largest music company in the world." 36 TTABVUE 433.

Confidential consumer research reveals that a surprisingly high percentage of United States consumers are aware of the SPOTIFY brand. 37 TTABVUE 14 and 39 TTABVUE 191-401 (Sauvaget Dec. ¶ 45 and Exs. 74-77); 45 TTABVUE 98 (Sauvaget Disc. Tr. 71); 46 TTABVUE 25. Media reports corroborate this evidence, often referring to Spotify as "well known." 29 TTABVUE 121, 125, 128, 132, 135, 139, 145, 154. A May 7, 2015 CHRISTIAN SCIENCE MONITOR article goes further, stating "Spotify is one of the most popular streaming music services on the planet." 29 TTABVUE 132. The Everett, Washington DAILY HERALD referred to Spotify as a "household name" in September 2016. *Id.* at 148. In October 2014, ANDROID HEADLINES ranked Spotify the second best streaming radio app for Android, also referring to the company as a "household name" which is "known around the world." *Id.* at 154.

Opposer believes that because "pot" is "a colloquial name for marijuana," an illegal drug under federal law, "consumers will associate the POTIFY mark with the promotion of marijuana use," and with the SPOTIFY mark. According to Opposer, any "association of marijuana-related goods and services with the SPOTIFY mark is likely to tarnish the SPOTIFY mark." 36 TTABVUE 16 (Sauvaget Dec. ¶ 52). In fact, Opposer prohibits a number of its promotional partners from displaying "the Spotify

---

[7] Prophet defines "relentlessly relevant brands" as those that "engage, surprise and connect …." 36 TTABVUE 393.

Marks on any website or user interface that … violates applicable laws or regulations." 39 TTABVUE 71, 99, 125, 154, 174, 189. This includes "illegal drug use or any other unlawful activity." 45 TTABVUE 24. Opposer "does not permit advertisements promoting the sale or use of drugs and drug-related products, including ads that promote the sale or use of marijuana … [Opposer's] internal guidelines for brand marketing prohibit references to marijuana and other drug content." *Id.* at 24, 122, 316 **(**Opposer's response to Interrogatory No. 10 and Opp. 30(b)(6) Disc. Tr. 95).

On the other hand, Opposer "offers and promotes certain music, podcast and video content related to marijuana through its website and mobile app," including "podcasts that discuss marijuana-related topics such as the legalization of cannabis, the science behind cannabis and cannabis business matters." 45 TTABVUE 12 (Opposer's response to Interrogatory No. 2). In addition, Opposer "creates video content related to marijuana, such as a short-form video series called 'Breaking Bread' featuring marijuana-infused meals hosted by various artists including Ty Dolla \$ign and City Girls as part of Spotify's 'Rap Caviar' playlist. Spotify plans to continue use of the SPOTIFY mark with such content, events and services." *Id.*

## B. Applicant

Applicant develops "sales systems, telemedicine systems, and enterprise resource planning systems." 43 TTABVUE (Suleimanov Dec. ¶ 2). According to Mr. Suleimanov, Applicant "relies on business-to-business interactions and only sells the platforms and systems to corporations and businesses, not to individual consumers."

*Id.* (Suleimanov Dec. ¶ 4). Applicant's subsidiary IndicaOnline "sells point-of-sale systems for legal marijuana dispensaries."[8] *Id.* at 3 (Suleimanov Dec. ¶ 5).

According to Applicant, its POTIFY platform "is a backend software platform designed for legal marijuana dispensaries to market and sell their products." *Id.* (Suleimanov Dec. ¶¶ 6, 7). Mr. Suleimanov testified that as with Applicant's other systems, the POTIFY platform is only sold "to legal marijuana dispensaries and not to individual consumers." *Id.* (Suleimanov Dec. ¶ 9). More specifically, "Applicant does not sell any products or services to any customers or patients of the legal marijuana dispensaries using the Potify platform and has no involvement in transactions between the dispensary and patient or customer other than providing the backend software platform." *Id.* (Suleimanov Dec. ¶ 10).

There is no dispute over when Applicant began using POTIFY for its identified software and related services. Applicant asserts in its Trial Brief that "the date of first use for the POTIFY Marks" is January 1, 2017. 52 TTABVUE 28. Opposer, in its Trial Brief, does not dispute this assertion. 50 TTABVUE 36.

While Applicant intends for its POTIFY platform to be used by dispensaries, 44 TTABVUE 2 (Suslov Dec. ¶ 3), Applicant's identification of goods is not so limited. Moreover, Mr. Suleimanov admits that dispensaries are "able to create a mobile application or website exhibiting the dispensary's unique branding. Customers of the dispensary are able to view the dispensary's menu, place orders online or via the

---

[8] Under federal law, there are no legal marijuana dispensaries. The references to "legal" marijuana dispensaries in this decision refer only to Applicant's characterizations in testimony, not to any conclusion as to the legality of marijuana dispensaries.

14

mobile application, and schedule pick up or delivery of the dispensary's products, using the Potify platform." *Id.* (Suleimanov Dec. ¶ 11). As Mr. Suslov put it: "Customers of legal marijuana dispensaries download the respective dispensary's mobile application or access the dispensary's website. These individual mobile applications or website use the Potify platform." 44 TTABVUE 3 (Suslov Dec. ¶ 8).

The record includes many examples showing that Applicant's POTIFY app is at least in part customer-facing, intended to be used by marijuana consumers and POTIFY-branded. For example, Applicant's Instagram page promotes the app as "Your MMJ [medical marijuana] Guide," and reveals that the app offers "featured deals" (discounts) from particular, app-searchable marijuana dispensaries:



32 TTABVUE 80, 157 (Suslov Disc. Tr. 45 and Ex. 6). Marijuana dispensaries promote the POTIFY app and website ("potify.net") as "a more relaxing way to order" online, and to have marijuana "ready within minutes for you to pick up":



*Id.* at 160.

Visitors to Applicant's Facebook page immediately encounter Applicant's "story," which indicates that Applicant "is an online ordering platform and community for medical and recreational **cannabis consumers** to connect with legal marijuana retailers," and that Applicant has "helped thousands of **patients and customers** order their favorite products from their preferred dispensary or delivery service":



*Id.* at 166 (emphasis added). Applicant's Instagram page similarly states that "Potify is the quickest way to access the best medical marijuana via your mobile device," and the Google Play listing for Applicant's POTIFY app includes essentially the same language. *Id.* at 169, 171.

In fact, Apple removed the POTIFY app from its App Store precisely because customers could use it to order marijuana for pick up at dispensaries. 35 TTABVUE 53 (Suleimanov Disc. Tr. 43). When asked whether the POTIFY platform is used "in order to make a sale of the cannabis," Mr. Suleimanov responded:

17

> … it's an e-commerce platform that allows [dispensaries'] customers to see their medium, place an order for pick-up. Some delivery services. They do that as well. But mainly it's in-store pick-up. So they offer discounts if you place an order online and come in and pick it up.

*Id.* at 59 (Suleimanov Disc. Tr. 49). Thus, notwithstanding Applicant's assertions to the contrary, individual consumers have interacted extensively with the POTIFY app, with Mr. Suleimanov testifying that the app has "almost a million active users." *Id.* at 54 (Suleimanov Disc. Tr. 44). And, when asked in an interrogatory to identify the products and services Applicant offers under the POTIFY mark, Applicant responded "[o]nline ordering or (sic) cannabis from licensed cannabis retailers through Applicant's mobile application and website." 32 TTABVUE 17 (response to Interrogatory No. 6). Similarly, during its discovery deposition under Fed. R. Civ. P. 30(b)(6), Applicant confirmed that the "app allow[s] individuals to order from the businesses that [Applicant has] sold [its] software to." *Id.* at 67 (Suslov Disc. Tr. 32).

In any event, Mr. Suleimanov became aware of Opposer in the Fall of 2012, and became a Spotify customer at that time. 43 TTABVUE 8 (Suleimanov Dec. ¶ 45). He began using the service regularly in late 2014 or early 2015. *Id.* (Suleimanov Dec. ¶ 46). Mr. Suslov became aware of Opposer in December 2012. 44 TTABVUE 4 (Suslov Dec. ¶ 16).

In 2014, Applicant wanted a name "that referenced being used in the marijuana industry," and "came up with the name POTIFY" after considering and rejecting the names "Pot Finder" and "Weedify." 43 TTABVUE 9 (Suleimanov Dec. ¶¶ 51-56). Applicant selected POTIFY "as there was no other company operating with that

18

name." *Id.* (Suleimanov Dec. ¶ 56). "In coming up with the name 'Potify,' [Suleimanov] did not think of Spotify or anything associated with Spotify," and "[t]he Spotify name did not come to mind when developing the name for Potify." *Id.* at 10 (Suleimanov Dec. ¶¶ 60-61). Mr. Suslov testified similarly, claiming that "[i]n coming up with the name" POTIFY, he "did not think of Spotify or anything associated with Spotify," and "did not intend to be associated with Spotify or anything affiliated with or related to Spotify." 44 TTABVUE 4 (Suslov Dec. ¶¶ 23, 25). According to Mr. Suslov, the POTIFY mark "comes from 'Pot', a common pseudonym for marijuana, with the fancy suffix '-IFY,' and means that marijuana can be found." *Id.* at 6 (Suslov Dec. ¶ 27).

During his discovery deposition, Mr. Suleimanov compared Applicant's POTIFY platform to Shopify, and testified that Shopify is "the reason why we picked [the name] Potify." 35 TTABVUE 42 (Suleimanov Disc. Tr. 32). More specifically, Applicant wanted to convey "being in the weed industry and, like, marketplace. And Shopify played a huge role in that. Like, we want to be Shopify … Like we'd been thinking about being a Shopify on Amazon." *Id.* at 72 (Suleimanov Disc. Tr. 62).

## III. Opposer's Entitlement to Statutory Cause of Action[9]

Entitlement to a statutory cause of action is a requirement in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370,

---

[9] Our decisions have previously analyzed the requirements of Sections 13 and 14 of the Trademark Act, 15 U.S.C. §§ 1063-64, under the rubric of "standing." We now refer to this inquiry as entitlement to a statutory cause of action. Despite the change in nomenclature, our prior decisions and those of the Federal Circuit interpreting Sections 13 and 14 remain equally applicable. *Chutter, Inc. v. Great Mgmt. Grp.*, 2021 USPQ2d 1001 at *10 n.39 (TTAB 2021) (citing *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388 at *2 (TTAB 2020)).

2020 USPQ2d 10837 at *3 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014)). A party in the position of plaintiff may oppose registration of a mark when doing so is within its zone of interests and it has a reasonable belief in damage that is proximately caused by registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at * 6-7 (Fed. Cir. 2020) (holding that the test in *Lexmark* is met by demonstrating a real interest in opposing or cancelling a registration of a mark, which satisfies the zone-of-interests requirement, and a reasonable belief in damage by the registration of a mark, which demonstrates damage proximately caused by registration of the mark).

Here, Opposer's pleaded registration, 30 TTABVUE 7, and prior use of its SPOTIFY mark, 36 TTABVUE 4-15, establish that it is entitled to oppose registration of Applicant's mark on the grounds of likelihood of confusion and dilution. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (registration establishes "standing"); *Syngenta Crop Prot. Inc. v. Bio-Chek LLC,* 90 USPQ2d 1112, 1118 (TTAB 2009) (testimony that opposer uses its mark "is sufficient to support opposer's allegations of a reasonable belief that it would be damaged …" where opposer alleged likelihood of confusion). Once Opposer has proven its entitlement to a statutory cause of action on one pleaded ground, it has established its entitlement for any other ground. *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1727-28 (Fed. Cir. 2012)).

**IV. Dilution**

Opposer alleges dilution by both blurring and tarnishment. 21 TTABVUE 31 (Opposer's ACR Brief at 25). To prevail, it must show that: (1) it owns a famous mark

that is distinctive; (2) Applicant is using a mark in commerce that allegedly dilutes Opposer's famous mark; (3) Applicant's use of its mark began after Opposer's became famous; and (4) Applicant's use of its mark is likely to cause dilution by blurring or tarnishment. *N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, 114 USPQ2d 1497, 1502 (TTAB 2015) (quoting *Coach Servs.*, 101 USPQ2d at 1723-24). Here, we find dilution by blurring, and therefore need not reach whether use of Applicant's mark is also likely to dilute Opposer's by tarnishment.

### A. Opposer Owns a Distinctive, Famous Mark

There is no dispute that Opposer's SPOTIFY mark is distinctive, both inherently, and by acquisition as a result of widespread use and consumer recognition. Conceptually, it is a coined, fanciful term. It is registered on the Principal Register without a claim of acquired distinctiveness, and is therefore presumed distinctive. *Sock It to Me, Inc. v. Fan*, 2020 USPQ2d 10611 at *10 (TTAB 2020). Applicant does not dispute that the mark is inherently distinctive.

As for whether the mark is sufficiently "famous" to be entitled to protection against dilution, we must determine whether it "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *N.Y. Yankees P'ship*, 114 USPQ2d at 1502 (quoting 15 U.S.C. § 1125(c)(2)(A)). In doing so, we consider:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

### 1. Advertising and Publicity

Opposer's mark has enjoyed extensive publicity since it was introduced to the United States a decade ago, in part as a result of widespread, extensive advertising by Opposer itself and its many promotional partners. The advertising and publicity-related evidence of record is overwhelming.

Opposer "promotes its products and services under the SPOTIFY mark to a wide variety of consumers, including across age groups (from younger users to older listeners) and across all geographic regions in the U.S. (from West, Northwest, Midwest, South and others)." 36 TTABVUE 4 (Sauvaget Dec. ¶ 11). Opposer also advertises in well known, national publications such as THE NEW YORK TIMES, THE WASHINGTON POST, VANITY FAIR and ROLLING STONE, as well as all of the major broadcast television networks, and many cable television and radio networks. It also advertises itself in connection with, and gains publicity from, several nationally televised or distributed programs in a variety of genres, which we can safely assume exposes fans of those programs to the SPOTIFY mark, even if those fans are not prospective SPOTIFY customers. 36 TTABVUE 7, 8, 106-09, 125, 138, 145 (Sauvaget Dec. ¶¶ 24, 26 and 28 and Exs. 21 and 29).

Similarly, Opposer has "exclusive podcast partnership deals" with famous celebrities including Michelle Obama, Joe Rogan and Kim Kardashian West, three

quite different people whose partnership with Opposer likely exposed a variety of Americans, including many who do not stream music, to the SPOTIFY mark. *Id.* at 13 (Sauvaget Dec. ¶¶ 41, 42). Less conventionally, Opposer has engaged consumers' imaginations with marketing efforts such as the "President of Playlists" job posting after President Obama expressed a desire to work for Opposer (itself a form of free advertising and publicity). This marketing effort was so successful and engaging that it became "the number one trending moment on Twitter." *Id.* at 11 (Sauvaget Dec. ¶ 34). The attention this episode received on Twitter strongly suggests that many Americans who listen to music in analog format or not at all were exposed to the SPOTIFY mark.[10]

### 2. Sales of Goods and Services Offered Under the SPOTIFY Mark

Measured by the number of users who "play at least one stream in a 30-day window," 36 TTABVUE 4 n.1, Opposer's sales of goods and services offered under the SPOTIFY mark were quite significant prior to Applicant's first use of its mark. 37 TTABVUE 4 (Sauvaget Dec. ¶ 9). In fact, in 2015, before Applicant's first use of its POTIFY mark, Opposer had more monthly SPOTIFY users than most U.S. states had residents.[11] Moreover, Opposer currently has several times as many monthly users

---

[10] As explained in footnote 5, we have not focused on Opposer's chart of its worldwide "Total Advertising and Sales Spend," as it only provides global figures for the years prior to Applicant's first use date. Nevertheless, the figures provided are quite large, and other evidence of record reveals that since before Applicant's first use of POTIFY, the United States has been one of Opposer's largest markets. 37 TTABVUE 413; 38 TTABVUE 8.

[11] census.gov/popclock/. The Board may take judicial notice of census data. *Blackhorse v. Pro-Football, Inc.*, 111 USPQ2d 1080, 1098 n.114 (TTAB 2014), *aff'd*, 112 F.Supp. 3d 439, 115

as it did in 2015. To say the very least, this evidence is significant, persuasive and corroborative of the advertising and publicity evidence. Not only have many Americans been exposed to the SPOTIFY mark, but a large percentage of Americans are users of or subscribers to Opposer's SPOTIFY goods and services.

### 3. Actual Recognition of the Mark

"Perhaps the most significant of the four elements set forth in the Act to determine fame is the extent of actual public recognition of the mark as a source-indicator for the goods or services in connection with which it is used." *TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1104 (TTAB 2018) (quoting *Nike Inc. v. Maher*, 100 USPQ2d 1018, 1024 (TTAB 2011)). It would be difficult to overstate the extent of public recognition of the SPOTIFY mark.

Opposer's 23.3 million Facebook "likes" (and its millions of followers on other social media platforms) evidences widespread recognition of the mark by a substantial fraction of the United States population. 36 TTABVUE 6-7 (Sauvaget Dec. ¶ 23); 31 TTABVUE 12, 24, 47. Opposer's search of the iWeb Corpus, an online database of 14 billion words, revealed that SPOTIFY had more Web "hits" than a number of other trademarks, including ROLEX, MCDONALD'S, AMERICAN EXPRESS, CHANEL and BARBIE. 29 TTABVUE 2, 5, 11, 50-61 (Otto Dec. ¶¶ 2-3, 9 and Exs. A and C). Opposer's "President of Playlists" marketing effort was so widely

USPQ2d 1524 (E.D. Va. 2015), *vacated on other grounds and remanded, Pro Football, Inc. v. Blackhorse*, 709 F. App'x 183 (per curiam) (4th Cir. 2018) (mem.).

recognized that it was "the number one trending moment on Twitter, and claimed the number one spot on Reddit." 36 TTABVUE 11 (Sauvaget Dec. ¶ 34). And Opposer's SPOTIFY brand is so strong that it has been ranked among the "best" or most "relevant" in the United States and beyond. 36 TTABVUE 15, 367-449 (Sauvaget Dec. ¶ 47 and Exs. 81-84).

Opposer also introduced empirical evidence that a substantial portion of the United States population is aware of the SPOTIFY brand. 37 TTABVUE 14 and 39 TTABVUE 191-401 (Sauvaget Dec. ¶ 45 and Exs. 74-77); 45 TTABVUE 98 (Sauvaget Disc. Tr. 71); 46 TTABVUE 25. This evidence is corroborated by media reports which refer to SPOTIFY as "well known" and a "household name." 29 TTABVUE 121, 125, 128, 132, 135, 139, 145, 148, 154.

The evidence leaves no doubt that SPOTIFY is among the most widely recognized brands in the United States.

### 4. SPOTIFY is Registered on the Principal Register

Opposer's SPOTIFY mark has been registered on the Principal Register in its broadest (standard character) form for almost 13 years. The incontestable '218 Registration is not based on a claim of acquired distinctiveness.

### 5. SPOTIFY is Famous

By any and all measures, SPOTIFY is exceedingly famous, and entitled to protection against dilution under 15 U.S.C. § 1125(c).

### B. Applicant is Using POTIFY, a Mark That Allegedly Dilutes Opposer's SPOTIFY Mark

Applicant is using its POTIFY mark in commerce and seeks to register it in the United States. Because Opposer bases one of its grounds for opposition on its allegation that POTIFY dilutes Opposer's SPOTIFY mark, this element is also satisfied. *See Chanel, Inc. v. Majarczyk,* 110 USPQ2d 2013, 2023 (TTAB 2014).

### C. Opposer's SPOTIFY Mark Was Famous Before Applicant's First Use of POTIFY

Applicant's primary argument in defense of Opposer's dilution claim is that "the SPOTIFY Mark was not famous as defined by 15 U.S.C. § 1125(c)(2)(A) before January 1, 2017," Applicant's date of first use. 52 TTABVUE 25-28.[12] Opposer's evidence belies Applicant's argument.

Indeed, while the record shows that SPOTIFY is **more** famous now than it was years ago, there is no question that the mark was famous in the United States well prior to January 1, 2017. In fact, based on the large number of pre-2017 Spotify MAUs[13] alone, we can infer that SPOTIFY became famous well before 2017. 37 TTABVUE 4, 120-158 (Sauvaget Dec. ¶ 9 and Ex. 5). The record shows that on January 1, 2015 the number of SPOTIFY MAUs was extraordinary (when compared to user/subscriber numbers which have justified findings of fame in other Board

---

[12] Applicant specifically contends, without support, that SPOTIFY did not become famous until "the viral moment that took place on January 9, 2017, when Opposer created a job posting titled the 'President of Playlists' with credentials that could only be met by former President Obama." 52 TTABVUE 27.

[13] Monthly active users.

cases). 37 TTABVUE 122. Opposer provided daily MAU figures for more than five years following January 1, 2015, showing that the number of SPOTIFY MAUs grew consistently from there, and came close to doubling before January 1, 2017. *Id.* at 122-158.[14] Furthermore, Equation Research found that years prior to January 1, 2017, a large percentage of United States consumers were aware of SPOTIFY. 37 TTABVUE 14 and 39 TTABVUE 194, 278 (Sauvaget Dec. ¶ 45 and Exs. 75, 76). In fact, United States consumer awareness of SPOTIFY compares favorably to levels of consumer awareness found to justify findings of fame in other Board cases. Articles published prior to January 1, 2017 refer to SPOTIFY as a "household name." 29 TTABVUE 148, 154. Additional pre-January 1, 2017 articles refer to SPOTIFY as "well known." *Id.* at 121, 125, 128, 132, 135, 139, 145. The United States has been one of Opposer's most significant markets since before Applicant's date of first use. 37 TTABVUE 14, 411, 413 (Sauvaget Dec. ¶ 45 and Exs. 74-77); 38 TTABVUE 8; 39 TTABVUE 192. The SPOTIFY mark was famous well before January 1, 2017, and has become even more famous since.

### D. Applicant's Use of Its POTIFY Mark is Likely to Cause Dilution By Blurring

Dilution by blurring is "an association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous

---

[14] As Opposer points out, in the weeks leading up to the January 9, 2017 "President of Playlists" job posting, the number of SPOTIFY MAUs was essentially the same as, and on some days more than, the number of SPOTIFY MAUs in the weeks following January 9, 2017. 37 TTABVUE 135-36.

mark." *Coach Servs.*, 101 USPQ2d at 1724 (quoting 15 U.S.C. § 1125(c)(2)(B)). It "occurs when a substantial percentage of consumers, on seeing the junior party's mark on its goods, are immediately reminded of the famous mark and associate the junior party's mark with the owner of the famous mark, even if they do not believe that the goods emanate from the famous mark's owner." *N.Y. Yankees P'ship*, 114 USPQ2d at 1509.

The concern is that "the gradual whittling away of distinctiveness will cause the trademark holder to suffer 'death by a thousand cuts.'" *Nat'l Pork Board v. Supreme Lobster and Seafood Co.*, 96 USPQ2d 1479, 1497 (TTAB 2010) (citation omitted). *See also, Enterprise Rent-A-Car Co. v. Advantage Rent-A-Car Inc.*, 330 F.3d 1333, 66 USPQ2d 1811, 1816 (Fed. Cir.) ("dilution law is intended to protect a mark's owner from dilution of the mark's value and uniqueness"). Blurring may occur "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." *Omega SA (Omega AG) (Omega Ltd.) v. Alpha Phi Omega*, 118 USPQ2d 1289, 1298 (TTAB 2016) (quoting 15 U.S.C. § 1125(c)).

To determine whether Applicant's use of its mark is likely to cause dilution by blurring, we consider:

> (i) the degree of similarity between Applicant's mark and Opposer's famous mark;
>
> (ii) the degree of inherent or acquired distinctiveness of Opposer's mark;
>
> (iii) the extent to which Opposer is engaging in substantially exclusive use of its mark;
>
> (iv) the degree of recognition of Opposer's mark;

(v) whether Applicant intended to create an association with Opposer's SPOTIFY mark; and

(vi) any actual association between Applicant's mark and Opposer's mark.

15 U.S.C. § 1125(c)(2)(B)(i-vi).

### 1. The Marks are Similar

We "consider the degree of similarity or dissimilarity of the marks in their entireties as to appearance, [sound], connotation, and commercial impression." *N.Y. Yankees P'ship*, 114 USPQ2d at 1506 (citing *Research in Motion Ltd. v. Defining Presence Mktg. Grp., Inc.*, 102 USPQ2d 1187, 1198 (TTAB 2012)). We must then determine whether Applicant's mark is sufficiently similar to Opposer's as to "trigger consumers to conjure up" Opposer's mark. *Nike*, 100 USPQ2d at 1030 (quoting *Nat'l Pork Bd.*, 96 USPQ2d at 1497).

Here, the marks are strikingly similar in "appearance, sound, connotation and commercial impression." *Cf. Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973)). In fact, they share the letters P-O-T-I-F-Y, with that being the entirety of Applicant's standard character mark and the literal element of its other mark. The only difference between Applicant's mark POTIFY and Opposer's mark SPOTIFY is that Opposer's starts with an "S," immediately before the shared letters P-O-T-I-F-Y. In other words, as Opposer points out, Applicant merely deleted the leading "S" from Opposer's mark. 50 TTABVUE 36-37.

29

Because Applicant's marks consist of the final six letters of Opposer's seven-letter mark, the marks look highly similar. *Research in Motion*, 102 USPQ2d at 1198 (TTAB 2012) ("we find that there is a high degree of similarity between applicant's mark [CRACKBERRY] and opposer's famous mark [BLACKBERRY]"). They also sound quite similar, and rhyme. *See also Russell Chem. Co. v. Wyandotte Chem. Corp.*, 337 F.2d 660, 143 USPQ 252 (CCPA 1964) (SENTOL similar in sound to SEN-TROL); *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1740-41 (TTAB 2014) (IKEA similar in sound to AKEA);

While the version of Applicant's mark in the word and design '185 Application includes a logo ( ), the word portion of the mark, POTIFY, is dominant. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1911 (Fed. Cir. 2012) ("the verbal portion of a word and design mark likely will be the dominant portion"); *In re Appetito Provisions Co. Inc.*, 3 USPQ2d 1553, 1554 (TTAB 1987) (holding that "if one of the marks comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods or services" and "because applicant's mark shares with registrant's mark that element responsible for creating its overall commercial impression, the marks are confusingly similar").[15]

---

[15] Opposer has established that it uses a logo that, like Applicant's, is green and circular. 36 TTABVUE 6 (Sauvaget Dec. ¶ 18) and 31 TTABVUE 47.

There is no evidence that either SPOTIFY or POTIFY have any meaning; they both appear to be coined, fanciful terms. Even if we presume that Opposer's mark will be perceived as a reference to the word "spot," and that Applicant's will be perceived as a reference to the word "pot," because the marks are so similar in appearance and sound, the marks will engender similar commercial impressions. *Cf., Inter Ikea Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1741 (TTAB 2014) (finding IKEA and AKEA similar, stating "[w]here, as here, both marks are coined terms that look alike and sound alike and there are no known differences in the meaning to distinguish them, the marks engender a similar commercial impression") (citing cases); *Atlas Supply Co. v. The Dayton Rubber Co.*, 125 USPQ 529, 530 (TTAB 1960) ("The marks 'PLYCRON' and 'NYCRON' are similar in composition, they bear a marked resemblance in sound, and they are both coined terms having no apparent meaning other than as trademarks. In view thereof, it is believed that purchasers of tires might reasonably attribute a common origin to 'PLYCRON' tires and 'NYCRON' cord for making tires …."). While Applicant points out, and we accept, that "pot" is a nickname for and thus suggestive or descriptive of marijuana, that is not the term Applicant seeks to register. The term in question is POTIFY, which is much closer in at least appearance and sound to Opposer's registered mark SPOTIFY than it is to "pot."

Furthermore, like Opposer's pleaded registration, Applicant's involved applications identify computer software which allows users to search for and obtain information (digital music and other digital content in Opposer's case and details

31

about medical marijuana dispensaries in Applicant's case). As Mr. Suslov testified, Applicant's mark "comes from 'Pot', a common pseudonym for marijuana, with the fancy suffix '-IFY,' and means that marijuana can be found." 44 TTABVUE 6 (Suslov Dec. ¶ 27); *see also* 43 TTABVUE 9 (Suleimanov Dec. ¶¶ 51-56). Opposer's software and services allow consumers to find music.

Because the marks SPOTIFY and POTIFY are used for software products that perform analogous functions, and are so similar in appearance and sound, their commercial impressions are similar even if consumers take different meanings from SPOT and POT. In short, we find that the marks are highly similar in their entireties, and that Applicant's mark will "trigger consumers to conjure up" Opposer's famous mark. This weighs in favor of finding dilution by blurring. This is true even for the Class 25 goods covered by the '717 Application because consumers familiar with Applicant's mark will understand that it is used with software products, which informs their impression of the mark.

### 2. Opposer's Mark is Highly Distinctive

As explained throughout this decision, Opposer's mark is nothing if not distinctive. It is coined, fanciful, registered on the Principal Register without a disclaimer or resort to Section 2(f) of the Act, and is among the most highly recognized marks in the United States. Indeed, a substantial portion of the United States population regularly uses SPOTIFY products and services. Applicant does not dispute that SPOTIFY is highly distinctive; instead, it deflects the question and changes the subject. 52 TTABVUE 41-42.

In any event, "[e]ven if the mark is not viewed as inherently distinctive, we found above that the mark is famous, which necessarily subsumes a finding that the mark has high acquired distinctiveness." *N.Y. Yankees P'ship*, 114 USPQ2d at 1507. *See also, Chanel, Inc.*, 110 USPQ2d at 2025 ("In any event, the discussion above regarding opposer's extensive evidence of fame of the CHANEL mark used in connection with clothing, fashion accessories, beauty products and boutiques more than sufficiently establishes that opposer's CHANEL mark has acquired a high degree of distinctiveness among consumers."). This factor also weighs in favor of finding dilution by blurring.[16]

### 3. Opposer's Use of SPOTIFY is Substantially Exclusive

There is no evidence that Opposer's use of SPOTIFY is anything other than exclusive. Applicant does not even address this factor in its Trial Brief, again deflecting the question and choosing to change the subject instead. 52 TTABVUE 41-42.

---

[16] Applicant cites a number of third-party registrations in an attempt to call the distinctiveness of Opposer's SPOTIFY mark into question. 42 TTABVUE; 45 TTABVUE 252-59; 52 TTABVUE 16-17, 53-54. Applicant's reliance on this evidence is misplaced. *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1470 n.6 (TTAB 1998) (third-party registrations are "not evidence that the marks shown therein are in use on a commercial scale or that the public is familiar with them"). Moreover, even if we agreed with Applicant that "there is a suggestive meaning to consumers that business names ending in –OTIFY sell software for online services and mobile applications," 52 TTABVUE 54, and that this portion of the parties' marks is somewhat conceptually weak as a result, that would not matter. The record as a whole establishes that SPOTIFY is inherently distinctive, and has acquired distinctiveness, as one of the country's most famous and well-known marks and that Opposer's SPOTIFY software and services are used by a large portion of the United States population. None of the marks Applicant cites are as close to SPOTIFY as is Applicant's mark POTIFY.

Opposer enforces its rights in the SPOTIFY mark vigorously, including through demand letters, and domain name and Board proceedings. 36 TTABVUE 15 (Sauvaget Dec. ¶ 49); 30 TTABVUE 23-78; 33 TTABVUE. This type of evidence has been found to establish "substantially exclusive use." *Chanel*, 110 USPQ2d at 2025-26; *UMG Recordings, Inc. v. Mattel, Inc.*, 100 USPQ2d 1868, 1899 (TTAB 2011); *Nike*, 100 USPQ2d at 1028.

This factor therefore also weighs in favor of finding dilution by blurring.

### 4. Opposer's SPOTIFY Mark is Widely Recognized in the United States

As explained in Section IV(A)(3), and elsewhere in this decision, few marks are as widely recognized in the United States as SPOTIFY. This factor weighs heavily in favor of finding dilution by blurring.

### 5. Applicant Apparently Intended to Create an Association with Opposer's SPOTIFY Mark

Applicant represents that its decision to adopt the POTIFY mark had nothing to do with Opposer or the SPOTIFY mark. 43 TTABVUE 9-10 (Suleimanov Dec. ¶¶ 51-56, 60-61); 44 TTABVUE 4, 6 (Suslov Dec. ¶¶ 23, 25, 27). This is hard to believe.

Like many Americans, Mr. Suleimanov and Mr. Suslov were both longtime SPOTIFY users prior to Applicant's adoption of POTIFY. In fact, Mr. Suleimanov was a heavy SPOTIFY user well before Applicant chose its POTIFY mark. 47 TTABVUE 2-322 (Ohle Reb. Dec. ¶¶ 3-6 and Exs. A-E). It defies logic and common sense that a longtime, frequent SPOTIFY user, and another longtime SPOTIFY user, jointly came up with the highly similar name POTIFY without intending to, or knowing that other users of the incredibly popular SPOTIFY service would, associate POTIFY with

SPOTIFY. The leap in logic and common sense Applicant asks us to take here is even more incredible when we consider that the POTIFY software and services perform many of the same functions as the SPOTIFY software and services, albeit in connection with marijuana rather than music.

Applicant's claim of innocent adoption calls to mind *Nat'l Pork Bd.*, 96 USPQ2d at 1479. There, the applicant adopted THE OTHER RED MEAT, even though the evidence showed that applicant's CEO was not only aware of the opposers' slogan THE OTHER WHITE MEAT, but also had "customer relationships with well-publicized restaurants in the Chicago area that prominently participated in opposers' THE OTHER WHITE MEAT campaign." *Nat'l Pork Bd.*, 96 TTABVUE at 1498. Thus, the CEO's "assertion that he came up with the slogan THE OTHER RED MEAT 'out of the blue' and without any thought of opposers' well-known slogan stretches credulity." *Id.* Ultimately, while we were "reluctant to conclude bad faith on the part of applicant," we found "that applicant's principals may have believed it was permissible for applicant to create such an association, and hence, consistent with a likelihood of dilution by blurring, resolve this factor in opposers' favor." *Id.*

In any event, even if we were to buy Applicant's claim of innocent adoption having nothing to do with SPOTIFY, that would not change the ultimate result, given our determinations regarding the other dilution factors.

### 6.   Actual Association Between POTIFY and SPOTIFY

Opposer performed a Google search of "POTIFY" which returned approximately 329,000,000 results. According to Opposer, all of the results were for SPOTIFY, while none were for POTIFY, the searched term. 29 TTABVUE 7, 115-16 (Otto Dec. ¶ 13

and Ex. G). Applicant does not dispute this claim. Thus, while there is no direct evidence that anyone has associated POTIFY with SPOTIFY as a result of conducting a Google search of POTIFY, it appears that Opposer is suggesting that we infer that such an association has occurred or will occur in the future. We do not discount the possibility, especially because Applicant has "almost a million active users," 35 TTABVUE 54 (Suleimanov Disc. Tr. 44), but we cannot find on this record that such an association has necessarily occurred.

In any event, because the marks are so similar in how they look and sound, and in their structure, cadence and essential nature, Applicant's mark will cause consumers to "conjure up" Opposer's famous mark, and "associate the two." *N.Y. Yankees*, 114 USPQ2d at 1507. As we held in the *Maher* case with respect to JUST JESU IT, "[u]pon encountering applicants' mark, consumers will be immediately reminded of opposer's JUST DO IT mark and associate applicants' mark with opposer's mark." *Nike Inc. v. Maher*, 100 USPQ2d at 1030.[17]

In the absence of direct evidence of association, we find this factor neutral.[18]

---

[17] We have found that where an application challenged on the ground of dilution is based on an intent to use, and the applicant "has not engaged in any actual use of the junior mark, it is impossible to present any evidence of actual association between the marks in the marketplace," but that does not preclude a finding of dilution when the balance of dilution factors weighs in favor of such a finding. *Nat'l Pork Bd.,* 96 USPQ2d at 1498. Indeed, we have found dilution in several cases despite there being no evidence of actual association, when the balance of the dilution by blurring factors in 15 U.S.C. § 1125(c)(2)(B)(i-vi) weighed in favor of finding dilution. *See e.g.*, *TiVo Brands*, 129 USPQ2d at 1117-18 ("the fact that there is no evidence of actual association between the marks and none was intended by Applicant do not outweigh the other dilution factors"); *N.Y. Yankees P'ship*, 114 USPQ2d at 1509-10, 1512; *Nike*, 100 USPQ2d at 1030-32.

[18] At the same time, we recognize that direct evidence of an actual association may be difficult to come by, and that any consumers reviewing the results of a Google search for POTIFY could make an actual association.

## V. Conclusion: Use of Applicant's Marks Will Impair the Distinctiveness of Opposer's Exceedingly Famous and Highly Distinctive SPOTIFY Mark

There is no question that SPOTIFY is as famous as marks come, that SPOTIFY goods and services are widely used and recognized by a large percentage of the United States population, or that Opposer's SPOTIFY mark is highly distinctive. This was the case prior to Applicant's claimed date of first use of its mark. Moreover, there is no evidence that any United States marks come as close to SPOTIFY as Applicant's POTIFY mark. Opposer is understandably concerned, 36 TTABVUE 16 (Sauvaget Dec. ¶ 51), and, although we need only find likely dilution, we find it inevitable that POTIFY "will diminish [SPOTIFY's] distinctiveness."

**Decision:** The oppositions are both sustained on Opposer's dilution by blurring claim.[19] Registration of Applicant's mark in both the '717 and '185 Applications is refused.

---

[19] We need not reach Opposer's likelihood of confusion or dilution by tarnishment claims. *Yazhong Inv. Ltd. v. Multi-Media Tech Ventures, Ltd.*, 126 USPQ2d 1526, 1540 (TTAB 2018); *Multisorb Tech., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013).